IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

NSC Partners, LLC, as              )
successor to Applied               )
Neurosolutions, Inc.,              )
                                   )
            Plaintiff,             )
                                   )
                                   )
        v.                         )    No. 24 C 4804
                                   )
                                   )
Eli Lilly and Company,             )
                                   )
            Defendant.             )

Memorandum Opinion and Order

Plaintiff NSC Partners, LLC, a Delaware limited liability company, filed the complaint in this case to compel defendant Eli Lilly and Company to arbitrate claims arising out of a certain Collaboration Agreement (and amendments thereto) between Lilly and NSC's predecessor-in-interest, the now defunct, public biotech company Applied NeuroSolutions, Inc. ("APNS").[1] That agreement, which was signed in November of 2006, established a multi-year, renewable collaboration between APNS and Lilly to commercialize the fruits of Alzheimer's research conducted by APNS's founding scientist, the late Dr. Peter Davies, and his laboratory at the Albert Einstein

---

[1] The facts recounted here are drawn from the complaint and from evidence the parties submitted after conducting jurisdictional discovery.

College of Medicine ("AECOM') in New York.[2] Pursuant to the Collaboration Agreement, APNS granted Lilly commercial licenses to products developed by Dr. Davies during the parties' collaboration, and Lilly agreed to make periodic and "milestone" payments to APNS, the latter of which were pegged to the achievement of certain developmental targets. Importantly for present purposes, certain rights and obligations set forth in the Collaboration Agreement survived the agreement's termination. In particular, in the event Lilly terminated the agreement due to default by APNS, Lilly would retain its commercial licenses to products developed through the parties' collaboration, and APNS would retain its right to receive 50% of the milestone payments the agreement established. ECF 25-1 at ¶ 17(c)(ii)(1).

In or around 2010, APNS defaulted on its obligations under the Collaboration Agreement, prompting Lilly to invoke the termination provisions just described in August of 2010. By that time, APNS was insolvent, and its only significant asset was its contingent right to the payments provided in the Collaboration Agreement. Hoping to restructure APNS and keep it afloat long enough for those rights to mature, NSC – whose sole member, Gregory Bolloten, was an influential

---

[2] Pursuant to agreements between APNS and AECOM that had been in effect since the 1990s, APNS held exclusive licenses to commercialize Dr. Davies' neurodegenerative disease discoveries in return for which it paid royalties to AECOM. Bolloten Decl., ECF 25 at ¶¶ 8-9; Chaffin Decl., Exh. 2, ECF 73-3 at 11.

investor in APNS, having helped to secure $8 million in funding to support the company's operations in 2004 for example – made a series of loans to APNS in August, September, and October of 2010. In exchange for each of these loans, APNS (i.e., "the Company") issued NSC a promissory note stating:

> This note is secured by all assets of the Company. This note is made and executed under, and is in all respects governed by, the laws of the State of Illinois.

Bolloten Decl., ECF 25 at ¶ 63 and Exh. N. *See also id.* at ¶¶ 69, 72. Then, on December 10, 2010, NSC filed a UCC Financing Statement with the Delaware Department of State, which named APNS as Debtor and provided:

> This FINANCING STATEMENT covers the following collateral: Secured by all assets of the company. In particular, secured by the Eli Lilly – Applied NeuroSolutions Collaboration Agreement dated 11-27-2006, including all associated contracts and amendments. This specifically includes, but is not limited to, the "Second Amendment" dated 11-25-2009 and effective 12-20-2009.

Bolloten Decl., ECF 25 at ¶ 76 and Exh. T.

APNS ceased operations and dissolved in or around January of 2011, without repaying NSC's loans secured by the promissory notes described above. The following year, through its attorney, NSC sent APNS a "Notice of Disposition of Collateral" notifying the company that it intended to sell "all assets of the Company, in particular the Eli Lilly – [APNS] Collaboration agreement..." at a public auction, and specifying the date, time, and location of the sale. Bolloten Decl., ECF 25 at ¶ 84 and Exhibit U. NSC also caused notice

3

of the sale to be published in a local newspaper serving Lake County, Illinois, where APNS had been headquartered. *Id*. at ¶¶ 85-87. NSC – the only bidder who appeared at the auction - purchased the collateral for credit against the indebtedness, after which NSC's counsel executed a Transfer Statement confirming that the collateral, "in particular the Eli Lilly – Applied NeuroSolutions collaboration Agreement dated 11-27-2026, including all associated contracts and amendments..." had been transferred to NSC. *Id*. at ¶ 88 and Exh. W.

Several years later, Mr. Bolloten discovered that Lilly was developing a drug derived from products developed by Dr. Davies and covered by the Collaboration Agreement. Specifically, he reviewed material Lilly presented at a 2017 Alzheimer's disease conference and an article published in a peer-reviewed medical journal, both of which discussed Lilly's use of antibodies Dr. Davies developed during the parties' collaboration. Based on these materials, and after consulting with Dr. Davies, Mr. Bolloten determined that several of the milestones established in the Collaboration Agreement had been achieved. Accordingly, NSC—as successor to APNS's rights under the Collaboration Agreement, demanded payment as provided by that agreement. *Id*. at ¶¶ 90-104 and exhibits cited therein.

In response to NSC's demand, Lilly requested and received documents and information from NSC. A meeting among attorneys and business people from NSC and Lilly occurred in April of 2019. Six

4

months later, Lilly formally refused NSC's payment demand on the ground that the documentation NSC provided did not "create a security interest in and to any assets of APNS." Bolloten Decl., Exh EE, ECF 25-31 at 2. According to Lilly, NSC had no ownership interest in ASPN's assets, and thus "no standing to make any claim against Lilly under the APNS [Collaboration] Agreement." *Id*.

To resolve its payment dispute with Lilly, NSC filed a Demand for Arbitration before JAMS in Chicago in May of 2024. Lilly refused to arbitrate. NSC then filed this action seeking an order compelling NSC to arbitrate – including the issue of arbitrability – and a declaration that a JAMS arbitrator must determine whether NSC can arbitrate its demand for payment from Lilly. Lilly moved to dismiss NSC's complaint on multiple grounds, including lack of personal jurisdiction.

Confining my analysis of Lilly's motion to threshold jurisdictional issues, I held that I could not determine on the pleadings whether Lilly's contractual relationship with APSN created a sufficiently substantial connection with Illinois to subject it to personal jurisdiction. *NSC Partners, LLC v. Eli Lilly & Co.*, 770 F. Supp. 3d 1118, 1123-24 (N.D. Ill. 2025). I concluded that NSC had "sufficiently identified in its brief contacts which, if supported, would subject Lilly to jurisdiction in this state," but that "assertions in briefs are not evidence," *id*. at 1123 (quoting *Mitze v. Colvin*, 782 F.3d 879, 882 (7th Cir. 2015). Accordingly, I denied

5

Lilly's motion (as well as NSC's co-pending motion for summary judgment) without prejudice and directed the parties to engage in limited jurisdictional discovery. That discovery is now complete, and Lilly has renewed its motion to dismiss, or, alternatively, to transfer this action to the District of Delaware, where Lilly filed a complaint against NSC one day after NSC filed this action, raising substantially the same issues. For the reasons that follow, I deny Lilly's motion.

## I. Jurisdiction

Personal jurisdiction comes in two varieties – general and specific – but all agree that specific jurisdiction is the only possibility here. My previous decision identified the "three essential requirements" for specific personal jurisdiction:

> (1) the defendant must have purposefully availed himself of the privilege of conducting business in the forum state or purposefully directed his activities at the state; (2) the alleged injury must have arisen from the defendant's forum-related activities; and (3) the exercise of jurisdiction must comport with traditional notions of fair play and substantial justice.

*NSC Partners,* 770 F. Supp. 3d at 1122 (quoting *Felland v. Clifton*, 682 F.3d 665, 673 (7th Cir. 2012)). I also outlined the relevant guideposts courts look to in resolving jurisdiction in breach-of-contract cases such as this:

> (1) "who initiated the transaction"; (2) "where the negotiations were conducted"; (3) "where the parties executed the contract"; (4) "where the defendant would have performed the contract"; (5) "whether the defendant was ever physically present in Illinois in connection with

the contract"; (6) "whether payment was to be made in Illinois"; and (7) "the occurrence of telephone calls or other communications to and from Illinois."

*Id.* at 1123 (N.D. Ill. 2025) (quoting *1st Bank Card Servs., Inc. v. Patel*, No. 17-cv-8744, 2018 WL 3608545, at *3 (N.D. Ill. July 27, 2018)). And I explained that because Lilly challenges personal jurisdiction in a motion to dismiss supported by written materials produced in jurisdictional discovery, NSC "need only make a prima facie showing of jurisdictional facts." *Id*. at 1122 (quoting *Tamburo v. Dworkin*, 601 F.3d 693, 700 (7th Cir. 2010). This means that I "take as true all well-pleaded facts alleged in the complaint and resolve any factual disputes in the affidavits in favor of the plaintiff." *Id.* (citations omitted).

Having reviewed the evidence of Lilly's contacts with Illinois in the course of its dealings with APNS, I am satisfied that my exercise of specific personal jurisdiction comports with due process. Evidence indicates that Lilly initiated the relationship with APNS that matured into the Collaboration Agreement. After Dr. Davies and others from APNS twice traveled to Lilly's Indiana facilities to discuss the potential collaboration, a five-person team from Lilly visited APNS at its Chicago-area headquarters, where the two teams met for dinner and a full-day meeting in June of 2006. *See* Chaffin Decl., Exhs. 7-9, ECF 73-8, 73-9, 73-10. Lilly tries to minimize the significance of Lilly's visit to APNS, calling it a mere "goodwill gesture" and insisting that the two entities'

7

substantive negotiations occurred in Indiana. But the June 2006 meeting agenda and internal status reports on the project that Lilly produced in discovery suggests otherwise. *See* ECF 73-10 at 9 (06/20/2006 email among Lilly employees setting forth agenda for the Chicago meeting with APNS, which allocated several hours to the parties' research plan followed by a discussion of "business terms" among other items); *id*. at 11 and 20 (stating that the research plan was "finalized" during Lilly's visit to ASPN facilities in June of 2006).

Similarly, Lilly's effort to characterize APNS as merely a "middleman" with no substantive role in its collaboration with Dr. Davies is belied by the evidence. There is no dispute that APNS controlled the intellectual property – most notably, Dr. Davies's discoveries – that was licensed to Lilly under the Collaboration Agreement. And documents produced in discovery reflect Lilly's understanding of APNS as instrumental to the achieving the objectives of the collaboration. For example, a document captioned "Spirit of the Alliance" allocates specific "Organizational Roles and Responsibilities" to each of APNS, AECOM, and Lilly. Chaffin Decl., Exh 26, ECF 73-27 at 4. It then identifies the members of the collaboration's "Management Team" as John DeBernardis on behalf of APNS, Peter Davies on behalf of AECOM, and two individuals on behalf of Lilly. *Id*. at 6. The document describes the Management Team's roles and responsibilities as: "Review and update the development

8

plan"; "Share data, information, and strategy"; "Attempt to resolve disputes on milestones"; and "Develop and implement publication and IP strategy," and specifies that "[c]ollaboration management team decisions must be unanimous to act." *Id*. A reasonable interpretation of this evidence is that Lilly understood and expected that APNS – which through Dr. DeBernardis held one-quarter of the Management Team's voting power – would play a meaningful role in the performance of the Collaboration Agreement. That is not the role of a mere "middleman."

Finally, both before and after the Collaboration Agreement and its amendments were signed, Lilly communicated by phone and email with Dr. DeBernardis and other APNS employees in Illinois and made payments under those agreements to APNS's Illinois bank account. *See, e.g.*, Hoffing Dep., ECF 73-11 at 41-42. And Lilly had an ownership interest in APNS, purchasing $500,000 worth of the company's stock during the parties' collaboration. Ellison Dep., ECF 73-4 at 71. These are not the kinds of "random, fortuitous, or attenuated" contacts with forum residents that have been rejected as a basis for personal jurisdiction in cases such as *Walden v. Fiore*, 571 U.S. 277 (2014), and *N. Grain Mktg., LLC v. Greving*, 743 F.3d 487, 493 (7th Cir. 2014). Instead, they show that Lilly "reach[ed] out beyond" its Indiana headquarters to forge a long-term relationship with an Illinois entity. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 479 (1985) (alteration in original). Indeed, Lilly

9

"purposefully established minimum contacts within the forum State." *Id*. at 476. And as I have already observed, because NSC filed this suit "to vindicate rights it claims to have under the Collaboration Agreement," 770 F. Supp. 3d at 1122-23, its injury relates to Lilly's forum activities.[3] These factors, along with the absence of any obvious unfairness to Lilly in compelling it – a well-resourced, Fortune 100 company – to litigate in a state neighboring its headquarters, persuade me that my exercise of personal jurisdiction over Lilly in this case is appropriate. Accordingly, I deny Lilly's motion to dismiss for lack of personal jurisdiction as well as its alternative request to transfer, which is rooted primarily in the argument that "jurisdictional quagmires justify transfer."  Reply, ECF 79 at 22.

## II.  NSC's Right to Compel Arbitration

Section 19(a) of the Collaboration Agreement provides that "[a]ny disputes arising under this Agreement will be resolved through arbitration...under the auspices of [JAMS]."  Compl., Exh. A at ECF 53. Lilly argues that NSC cannot compel arbitration of its claim for milestone payments under the Collaboration Agreement because: 1) NSC never acquired any interest in that agreement, so it has no standing

---

[3] Although Lilly characterizes this case as action "to settle the validity of NSC's invalid acquisition of APNS's rights through a California foreclosure sale," Def.'s Mem., ECF 56 at 8, I previously held that this "frames the relevant contacts too narrowly" for purposes of the jurisdictional analysis. 770 F. Supp. 3d at 1122.

10

to enforce it; and 2) even if it had, the agreement itself specifically limits the parties who may invoke arbitration to "APNS and [Lilly]." *Id.* Whatever the merits of the first argument, I agree with NSC that Lilly has no standing to raise it.

Lilly's challenge to NSC's security interest is two-fold: First, it argues that the promissory notes APNS issued to NSC did not create a valid security interests because their description of the secured collateral – "all assets of the company" – is "supergeneric" and thus insufficient under 810 Ill. Comp. Stat. 5/9-108(c). Second, it argues that the UCC financing statement NSC filed to perfect its security interest, which specifically identifies the Collaboration Agreement and amendments thereto as the secured collateral, cannot cure the notes' deficiency because the financing statement was not signed by APNS. Lilly lacks standing as to each dimension of this challenge.

A security agreement is a contract, and "[o]rdinarily, only a party (actual or alleged) to a contract can challenge its validity." *Falconbridge U.S., Inc. v. Bank One Ill., N.A. (In re Vic Supply Co.)*, 227 F.3d 928, 930 (7th Cir. 2000). Lilly argues that because it has a "real interest" in whether it is liable to NSC, as APNS's successor, for "millions of dollars" under the Collaboration Agreement, it has standing to challenge the security agreement. But "the fact that a third party would be better off if a contract were unenforceable does not give him standing to sue to void the

11

contract." *Id*. at 931. Lilly strains to distinguish *Falconbridge* on the ground that that case did not "address a challenge to the **existence** of a contract to which the **challenger is a party**." Reply, ECF 79 at 16. By Lilly's lights, *Falconbridge* is inapposite because Lilly "is not a 'stranger' attempting to 'break up a contractual relation' to obtain a 'windfall.'" *Id*. (quoting *Falconbridge*) (Lilly's emphasis). But the agreement whose validity Lilly attacks is not the Collaboration Agreement to which Lilly is a party, but rather the security agreement between APNS and NSC, to which Lilly is no less a stranger than the creditor who challenged the security agreement in *Falconbridge*. Lilly's sleight-of-hand offers no basis for departing from the principles of that case.[4]

And if there remained room for doubt, the Seventh Circuit drove the same principles home in *GP Credit Co., LLC v. Orlando Residence, Ltd.*, 349 F.3d 976, 982 (7th Cir. 2003). The plaintiff in *GP Credit* was a creditor who claimed the right, as the debtor's successor, to proceeds from the debtor's successful lawsuit against a third party. The defendant claimed to have a judgment lien against the debtor and

---

[4] The *Falconbridge* court went on to discuss certain exceptions to this general rule, observing that "subsequent creditors...misled by an inadequate description" of the collateral secured may have standing to challenge the security agreement, and that a third party deceived by the contract might have a tort remedy against a contracting party. 227 F.3d at 931-32. But Lilly does not claim to be a subsequent creditor or to have been misled or deceived by the security agreement, nor does it assert any tort claim based on the security agreement.

12

challenged *GP Credit*'s successorship right to the proceeds from the debtor's lawsuit suit.

Like NSC, whose interest in the Collaboration Agreement arises out of its foreclosure of its security agreement with APNS followed by its purchase of the collateral securing that agreement at the foreclosure sale, the plaintiff in *GP Credit* claimed title to the debtor's lawsuit proceeds based on its foreclosure of a loan agreement secured by "any and all personal property" of the debtor, followed by its purchase of that collateral at the foreclosure sale. And like Lilly, the defendant in *GP Credit* challenged the plaintiff's title to the lawsuit proceeds on the basis that the description of the collateral securing the loan agreement was too vague. *Id*. The court declined to entertain the defendant's argument, explaining:

> We need not decide whether this language was really too vague. The purpose of the security agreement in a UCC-governed secured transaction, as distinct from the financing statement, is to define the rights of the parties to the security agreement, not to confer rights on third parties. *Milwaukee Mack Sales, Inc. v. First Wisconsin National Bank,* 93 Wis.2d 589, 287 N.W.2d 708, 713 (1980). So only subsequent creditors who have actually read the security agreement and been misled by a vague description in it can challenge the sufficiency of the description. *National Bank of Fulton County v. Haupricht Bros., Inc.,* 55 Ohio App.3d 249, 564 N.E.2d 101, 114 (1988) (per curiam).

*Id. at* 982–83 (7th Cir. 2003). The defendant's interest in invalidating the security agreement so that the lawsuit proceeds would remain with the debtor and be available to satisfy the defendant's asserted judgment lien was insufficient to give the

13

defendant standing to challenge the security agreement. *Id*. So too, here: Lilly's interest in invalidating the security agreement so that APNS's rights under the Collaboration Agreement "died with APNS" and were never transferred to NSC for enforcement, Def.'s Mem., ECF 56 at 13, does not empower Lilly to challenge the security agreement to which it was not a party. None of the cases Lilly cites is to the contrary.

This leaves only the question whether the arbitration provisions in the Collaboration Agreement empower NSC, as APNS's successor, to compel Lilly to arbitrate its demand for milestone payments. At the outset, it bears clarifying that this question is for me, not the arbitrator, to decide. In its complaint, NSC seeks to compel Lilly "to arbitrate with NSC, *including all issues as to arbitrability*," as well as a declaration that NSC is entitled "to arbitration of all issues in dispute, *including arbitrability*." Compl., ECF 11 at ¶¶ 139, 143. But "[c]ourts should not assume that the parties agreed to arbitrate arbitrability unless there is 'clea[r] and unmistakabl[e]' evidence that they did so." *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995) (quoting *AT & T Techs., Inc. v. Commc'ns Workers of Am.,* 475 U.S. 643, 649 (1986) ("the question of whether the parties agreed to arbitrate is to be decided by the court, not the arbitrator") (alterations in *First Options*). Here, APNs and Lilly broadly agreed to arbitrate "[a]ny disputes arising under" the Collaboration

14

Agreement, but they explicitly agreed that either party could "bring an action in any court of competent jurisdiction to compel arbitration under this Agreement and to enforce an arbitration award." ECF 11 at 53. These provisions negate any inference that the parties intended to arbitrate the question of arbitrability.

Lilly argues that even if NSC succeeded to some of the rights the Collaboration Agreement granted to APNS, it is not entitled to enforce the arbitration provisions. In Lilly's view, the arbitration provisions limit enforcement authority to "APNS and LILLY" as those terms are defined in the agreement's opening paragraph, which makes no mention of "successors" or "assigns." But this argument wholly ignores the agreement's Section 19(d), which is specifically directed to assignment and succession. That section provides:

> The parties may not assign this Agreement, or any right or obligations hereunder, without the prior written consent of the other party, *except either party may assign this entire Agreement in connection with the sale of all or substantially all of its business and assets relating to this Agreement, whether by sale of assets, sale of stock, merger or otherwise. In addition, either party may assign any or all of its rights under this Agreement to any third party financing source in connection with any debt financing which may be entered into by such party. This Agreement will inure to the benefit of, and be binding upon, the legal representatives, and permitted successors and assigns of APNS and LILLY.*

Compl., Exh. A, ECF 11 at 53. This section explicitly authorizes either party to transfer the "entire Agreement" in connection with the sale of "all of its...assets," which is exactly what APNS did in the sequence of security and foreclosure transactions culminating in

15

the transfer of all of its assets to NSC in the foreclosure sale. Lilly's interpretation that only APNS and Lilly, but not their successors or assigns, can invoke the agreement's Arbitration provisions cannot be squared with the text of Section 19(d). As APNS's successor to the entire Collaboration Agreement, NSC is entitled to enforce its arbitration provisions.

### III. Conclusion

For the foregoing reasons, I conclude that Lilly lacks standing to challenge NSC's ownership by succession of APNS's rights under the Collaboration Agreement, including the right to enforce the arbitration provisions of that agreement. Accordingly, Lilly's motion to dismiss or transfer the complaint is denied, and Lilly is ordered to arbitrate NSC's demand for milestone payments under the Collaboration Agreement.

**ENTER ORDER:**

**Elaine E. Bucklo**
United States District Judge

Dated: March 10, 2026

16